**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-00693-001-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Natalie Renee Hoffman, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Defendants Natalie Hoffman, Oona Holcomb, Madeline Huse, and Zaachila Orozco-McCormick (collectively "Defendants") appeal from convictions for violations of the regulations governing the Cabeza Prieta National Wildlife Refuge ("the CPNWR" or "the Refuge"). The violations were committed in the course of leaving supplies of food and water in an area of desert wilderness where people frequently die of dehydration and exposure. Defendants, who are volunteers with a charitable organization affiliated with the Unitarian Universalist Church, admit the factual allegations made by the Government. They entered the Refuge without a permit, drove on a restricted-access road, and left food and water for those in need to find. Defendants argue that those actions, taken with the avowed goal of mitigating death and suffering, were sincere exercises of religion and that their prosecution is barred by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA" or "the Act"). The Court finds that Defendants demonstrated that their prosecution for this conduct substantially burdens their exercise of sincerely held religious

beliefs, and that the Government failed to demonstrate that prosecuting Defendants is the least restrictive means of furthering any compelling governmental interest.

## II.    FACTUAL BACKGROUND

On August 13, 2017, Defendants entered the CPNWR, drove down a restricted-access road, and left bottles of water and cans of food at several pre-selected locations along foot trails used by people entering the United States unlawfully. Fish and Wildlife ("FWS") Officer Michael West encountered Defendants, who admitted that they did not have a permit to be on the CPNWR. (Reporter's Transcript of Day 1 of Trial ("RT1"), Doc. 170 at 46:20-25, 48:15-18, D. Ariz. Case No. 4:17-mj-00339-BPV.) Officer West directed Defendants to exit the Refuge, which they did. (*Id.* at 51:23-25.) No citations or notices of violation were issued at that time. (*Id.* at 82:15-18.)

Defendants are volunteers with "No More Deaths/No Más Muertes," a "faith-based organization" and "ministry of the Unitarian Universalist Church of Tucson." (RT1 at 201:18-19.) A founding volunteer of that organization testified that No More Deaths is a "humanitarian aid organization" that was founded in 1999 "to provide food and water and medical care in the desert." (*Id.* at 199:18-20.) At that time, increased immigration enforcement in Texas and California began to "funnel the migration pattern right through the Tucson sector of the border," leading to large numbers of unauthorized migrants dying while attempting to cross the remote desert wilderness of southern Arizona on foot. (*Id.* at 199:20-25.) According to the Pima County Medical Examiner, 2,816 sets of "undocumented border crosser remains" were recovered in Arizona between the years 2000 and 2017.[1] (Trial Exhibit ("Tr. Ex.") 226 at 30). No More Deaths began tracking those deaths and leaving jugs of water in areas where human remains had been recovered. (*Id.* at 200:2-10.)

The CPNWR, which is in southwestern Arizona, shares a 56-mile border with Sonora, Mexico. (RT1 at 123:12-13.) Visitors are required to obtain permits and sign a

---

[1] This figure reflects only the number of recovered sets of human remains. Testimony introduced at trial suggested that remains are recovered for as few as one in ten migrants who die in this unpopulated area. (RT1 at 167:3-21; RT2 at 79:16-21.)

hold harmless agreement to enter the Refuge. (*Id.* at 28:17-19.) The hold harmless agreement describes the Refuge as "one of the most extreme environments in North America," and warns that the area "contains no sources of safe drinking water." (Tr. Ex. 2.) The CPNWR contains numerous trails used by migrants, and, according to the Pima County Medical Examiner, 32 sets of human remains were recovered from the CPNWR in 2017 alone. (Tr. Ex. 133.) Those deaths are despite the presence of "rescue beacons" installed and operated by the United States Border Patrol. (RT1 at 39:15-23.) The month before Defendants entered the CPNWR without a permit, the permit application was amended to specifically prohibit the leaving of "water bottles, water containers, food, food items, food containers, blankets, clothing, footwear, [and] medical supplies" on the CPNWR. (RT1 at 74:1-17; Tr. Ex. 2 ¶13.)

### III.  PROCEDURAL BACKGROUND

On December 6, 2017, Defendants were charged by criminal information with entering the CPNWR without a permit in violation of 50 C.F.R. § 26.22(b) and abandoning property in violation of 50 C.F.R. § 27.93. (Doc. 1.)[2] Defendant Hoffman was also charged with driving in a wilderness area in violation of 50 C.F.R. § 35.5. (*Id.*)

Defendants filed motions to dismiss based on international law (Doc 72), the Administrative Procedures Act (Doc. 70), entrapment by estoppel (Doc. 70), selective enforcement (Doc. 83), and RFRA (Doc 84). Magistrate Judge Bruce G. MacDonald set these motions for a hearing (Doc. 79), but then vacated the hearing and indicated that rulings on the pending motions would issue without argument (Doc. 122). He then recused himself and reassigned the case. (Doc. 132.) His replacement, Magistrate Judge Bernardo P. Velasco, denied all pending motions to dismiss and motions to compel disclosure, but granted Defendants leave to present their RFRA and entrapment by estoppel arguments as defenses at trial. (Doc. 136.)

---

[2] Unless otherwise noted, docket citations refer to the CM/ECF docket of the underlying proceeding, Case No. 4:17-mj-00339-BPV in the United States District Court for the District of Arizona. All record citations refer to the page numbers generated by the Court's electronic filing system.

After a three-day bench trial, Defendants were convicted of all counts. (Docs. 158-161.) The three-page verdict did not analyze Defendants' RFRA defense. (Doc. 166.) Defendants were ordered to pay fines and sentenced to terms of probation, during which they are banned from entering the CPNWR. (Docs. 183, 184, 185, 186.)

Defendants now appeal their judgments of conviction (Docs. 183-186) and "all prior orders encompassed in those judgments" to the United States District Court for the District of Arizona. (Doc. 189.) Because the Court reverses the Defendants' convictions based on their RFRA defense, the Court does not address the prior orders encompassed in Defendants' judgments of conviction, nor the other affirmative defenses raised by Defendants.

## IV. STANDARD OF REVIEW

The parties disagree as to the appropriate standard of review. Defendants argue that the denial of RFRA relief is reviewed *de novo*. (Defendants' Opening Brief ("Def. Op. Br."), Doc. 8 at 14, D. Ariz. Case No. 4:19-cr-00693-RM; Defendants' Reply Brief ("Def. Rep. Br."), Doc. 20 at 9, D. Ariz. Case No. 4:19-cr-00693-RM.) Defendants recognize that factual findings are reviewed on appeal for clear error, but they argue that clear-error review is inapplicable here because the magistrate judge's verdict did not make specific factual findings regarding Defendants' RFRA defense.[3] (Def. Rep. Br. at 9 (citing *United States v. Prieto-Villa*, 910 F.2d 601, 605 (9th Cir. 1990).) The Government similarly recognizes that, following a bench trial resulting in a criminal conviction, conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error. (Government's Response Brief ("Gov. Br."), Doc. 16 at 7, D. Ariz. Case No. 4:19-cr-00693-RM.) However, the Government argues that this Court should apply the highly deferential

---

[3] Magistrate Judge Velasco's verdict did not make factual findings or conclusions of law regarding Defendants' RFRA defense. The verdict instead characterized Defendant's RFRA defense as "a modified *Antigone* defense." (Doc. 166.) An Amicus Brief filed in this matter by professors of religious liberty explains that *Antigone* is a Greek tragedy written by Sophocles that explores "a tension between the King's law – a formal edict that prohibited the burial of Antigone's brother Polynices – and the unwritten law of the Gods that mandated a proper burial so as to fulfill a duty to honor and mourn the dead." (Amicus Brief of Professors of Religious Liberty, Doc. 10 at 6, D. Ariz. Case No. 4:19-cr-00693-RM.)

sufficiency-of-evidence standard and ask if, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).) [4]

A person convicted before a magistrate judge has the right to appeal to the United States District Court. 18 U.S.C. § 3402. "The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). An appellate court reviews a trial court's "conclusions of law following a bench trial *de novo* and its findings of fact for clear error." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008) (en banc) (citing *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004)). The Ninth Circuit has indicated that "[w]hether application of a federal law violates RFRA is a question of statutory construction for the court" that is reviewed *de novo*, *United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008), although "any findings of 'historical fact' underlying" the trial court's conclusions are reviewed for clear error, *Christie*, 825 F.3d at 1056.

## V. DISCUSSION

RFRA provides "very broad protection for religious liberty" by exempting religious believers from laws that substantially burden the exercise of their religious beliefs. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). The Government must provide such an exemption unless the application of the law to the believer is the "least restrictive means" of furthering a "compelling government interest." 42 U.S.C. § 2000bb-1(b). A RFRA claim may be brought as an affirmative defense to criminal charges. *United States v. Christie*, 825 F.3d 1048, 1065 (9th Cir. 2016).

---

[4] The Court is not convinced that the sufficiency-of-evidence standard proposed by the Government is applicable here, as Defendants do not challenge whether the Government established the elements of the regulatory violations for which they were convicted but, instead, challenge Magistrate Judge Velasco's rejection of their RFRA defense. To succeed on their RFRA defense, Defendants bore the initial burden of demonstrating that their prosecution substantially burdened their sincere religious exercise. As Defendants bore that burden, the Court cannot evaluate the "sufficiency" of the Government's evidence.

The Act was passed after the Supreme Court held—reversing prior case law—that the Free Exercise Clause of the First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *See Employment Div. v. Smith,* 494 U.S. 872, 879 (1990) (internal quotation marks omitted). Congress enacted RFRA in response, seeking to "restore" religious exemptions from nondiscriminatory "rule[s] of general applicability." § 2000bb-1(a). RFRA therefore reflected Congress' judgment that "laws [that are] 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." § 2000bb(a)(2).

To succeed on a RFRA defense, a claimant must first make two showings: (1) governmental action burdens a sincere "exercise of religion" and (2) the burden is "substantial." *Navajo Nation*, 535 F.3d at 1068. A RFRA claim that does not establish these two elements fails. *Id.* If a claimant does demonstrate a substantial burden on her sincere exercise of religious belief, a court must find a RFRA violation unless the Government demonstrates that "application of the burden to the person" both (1) "furthers a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling government interest." § 2000bb-1(b).

**A.      Sincere "Exercise of Religion" under RFRA**

To prevail on their RFRA defense, Defendants must first demonstrate that they are being prosecuted for actions that constitute a sincere "exercise of religion." 42 U.S.C. § 2000bb. Although Defendants do not claim to be members of mainstream or traditional congregations, they do argue that their volunteer activities with No More Deaths are exercises of sincerely held religious and spiritual beliefs.

The Supreme Court has long recognized that "a determination of what is a 'religious' belief or practice" is "a most delicate question[.]" *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). The Court's analysis cannot "turn upon a judicial perception of the particular belief or practice in question." *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 714 (1981). Beliefs do not need to be "acceptable, logical,

consistent, or comprehensible to others" to constitute religious beliefs. *Id.* "[R]eligious experiences which are as real as life to some may be incomprehensible to others." *United States v. Ballard*, 322 U.S. 78, 86-87 (1944).

In determining whether a set of beliefs should be protected as "religious," the Ninth Circuit has analyzed "whether the beliefs professed … are sincerely held and whether they are, in [a claimant's] own scheme of things, religious." *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) (quoting *United States v. Seeger,* 380 U.S. 163, 174 (1965)). "'Religious' beliefs, then, are those that stem from a person's 'moral, ethical, or religious beliefs about what is right and wrong' and are 'held with the strength of traditional religious convictions.'" *Ward,* 989 F.2d at 1018 (quoting *Welsh v. United States*, 398 U.S. 333, 340 (1970)).

In *Ward,* a criminal defendant refused to testify in his defense because he objected on purportedly religious grounds to swearing to tell the "truth." 989 F.2d at 1017. As the court explained, the claimant in that case believed that "honesty is superior to truth" and requested an alternative oath that replaced the word "truth" with "fully integrated honesty." *Id.* The contours of this set of beliefs were not entirely clear, and the court "[did] not attempt to explain" the basis of the claimant's views. *Id.* The Ninth Circuit nonetheless reversed his conviction, explaining that although the claimant did "not describe his beliefs in terms ordinarily used in discussion of theology or cosmology . . . he clearly attempt[ed] to express a moral or ethical sense of right and wrong." *Id.* at 1018.

The Ninth Circuit's approach has been called "a generous functional[5] (and even idiosyncratic)" approach to determining religiosity. *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1537 (9th Cir. 1985) (Canby, J., concurring). This standard draws heavily from *United States v. Seeger*, in which the Supreme Court considered claims brought by individuals who requested draft exemptions based on spiritual, ethical, and philosophical

---

[5] It is a "functional" approach because instead of relying on a general definition of religion, it looks to whether a set of beliefs serves the same *function* as traditional religion in an individual's life. *See Ward*, 989 F.2d at 1018.

objections to war. 380 U.S. at 164. The *Seeger* Court analyzed whether the claimants' beliefs "occup[ied] the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for the exception[.]" *Id.* Applying this test, the Court found conscientious-objector status warranted for, among others, a claimant with a "belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed . . . without belief in God, except in the remotest sense." *Id.* at 166 (internal quotation marks omitted).

The Government urges this Court to instead apply a multifactor analysis to determine whether Defendants' beliefs are "religious." (Gov. Br. 8-9.) The Ninth Circuit, however, has not adopted this approach to determine what beliefs are worthy of protection under the Free Exercise Clause or RFRA. The Government cites to a case declining to adopt this approach, *United States v. Lepp*, No. CR 04-00317 MHP, 2008 WL 3843283, at *4 (N.D. Cal. Aug. 14, 2008), *aff'd,* 446 F. App'x 44 (9th Cir. 2011). The Court in *Lepp* noted the five factors laid out in *United States v. Meyers*, 95 F.3d 1475, 1475 (10th Cir. 1996), but ultimately "declin[ed] any invitation to define religion" and instead cited to the dissent in *Meyers* for the proposition that "[t]he ability to define religion is the power to deny freedom of religion." *Lepp*, 2008 WL 3843283, at *4 (citing *Meyers*, 95 F.3d at 1489) (Brorby, J., dissenting)).

The Court finds that the proper standard to apply here is whether the beliefs professed are sincerely held and whether they are, in Defendants' own scheme of things, religious. *See Ward*, 989 F.2d at 1018. Defendants here are volunteers with an organization, No More Deaths, which is a "ministry" of the Unitarian Universalist Church of Tucson and a faith-based organization that was founded by religious leaders. (RT1 at 201:11-21.) The body camera footage of the FWS Officer who encountered the Defendants on the CPNWR shows that the Defendants immediately identified themselves as "from the Church in Tucson." (Tr. Ex. 40 at 1:36-1:42.) The truck Defendants were driving was registered to the Unitarian Universalist Church. (RT1 at 82:3-4.)

Reverend John Fife, a retired Presbyterian minister and "founding volunteer" of No

More Deaths, testified that "the life of faith is not simply a matter of belief or creed," but is fundamentally "a matter of what you do in relationship to those who are in most need." (RT1 at 203:2-8.) He explained that this belief flows, in part, from the New Testament parable that describes Jesus' teaching at the Last Judgment that, "I was hungry, I was thirsty, I was naked, I was in prison, I was an alien, and as you do it to least of these, my brothers and sisters, you do it to me." (*Id*. at 202:19-25—203:1.) Volunteers therefore exercise their "faith out there in the desert through No More Deaths" by providing "humanitarian aid directly where most of the death [is] occurring in the desert." (*Id.* at 201:21-25—202:3.) The "faith basis" of No More Deaths and "the spirituality and the spiritual principles that have founded [that] organization and formed that community" is made "very clear" in No More Deaths' volunteer training. (*Id.* at 204:12-19.)

Defendant Holcomb testified that she was familiar with Reverend Fife's beliefs and largely subscribed to those beliefs. (Reporter's Transcript of Day 2 of Trial ("RT2"), Doc. 171 at 149:1-7, D. Ariz. Case No. 4:17-mj-00339-BPV.) Holcomb testified that although sometimes speaking about those beliefs in a different way, she "share[d] the belief that there is . . . for me, I will say, like a deep spiritual need and a calling to do work based on what I believe in the world." (*Id.* at 149:3-7.) She felt "this really spiritual . . . tie to [immigrants crossing the border]" that provoked a "kind of intense feeling" when providing humanitarian aid, "especially when you have found things that people who are migrating have left . . . You can feel their presence . . ." (*Id.* at 172:11-17.) She described the ritualistic taking of moments of silence in the course of No More Deaths' humanitarian aid work, and a "personal altar" that she had constructed at her home, which included "a ring of water bottle[s] that I picked up in the desert." (*Id.* at 173:3-9, 20-22.)

Defendant Huse explained that she "grew up going to church" and that she internalized from that experience values of "love, compassion, and the sanctity of human life." (Reporter's Transcript of Day 3 of Trial ("RT3"), Doc. 172 at 96:11-13, 97:1-5, D. Ariz. Case No. 4:17-mj-00339-BPV.) She "agree[d] with a lot of John Fife's beliefs" and had attended services at various Unitarian Universalist churches in multiple states. (*Id.* at

97:4-8.) Defendant Huse began to volunteer with No More Deaths because of her belief in the "sanctity of human life." (*Id.* at 96:7-13.) She "felt compelled to be there" and "do [her] part as a fellow human being." (*Id.* at 97:12-14.) When volunteering with No More Deaths, she observed a spiritual practice of taking moments of silence "to be present in the moment and think of those who are suffering and just put some love out for them . . ." (*Id.* at 95:18-20.)

Defendant Orozco-McCormick, whose father was Catholic, was raised with a belief "in the sanctity of life and of death." (*Id.* at 14:11-14.) She considered No More Deaths' humanitarian aid activities to be "sacred," because volunteers hike in areas where other humans are facing the possibility of death. (*Id.* at 19:6-8.) "[I]t's very different to be standing on that same ground [where people were dying], and it's to be revered. It's to be respected." (*Id.* at 19:17-20.) Defendant Orozco-McCormick felt compelled to volunteer because of her belief that "everybody [is] connected" and that "water is life." (*Id.* at 15:14-16.) She also described "a sort" of prayer where volunteers would observe "moments of silence for people that have crossed or are currently crossing the desert." (*Id.* at 16:12-16.)

Finally, Defendant Natalie Hoffman testified that she believes that "all life is sacred" because "all life is connected to the earth." (*Id.* at 53:20-25.) Although she didn't "consider [herself] a part of any specific congregation" or of "traditional organized religion," she nonetheless had "a spiritual calling to help other people" and mostly agreed with the views as articulated by Reverend Fife. (*Id.* 55:10-17.) She "felt a spiritual connection" to the humanitarian aid activities because "life is sacred, including human life." (*Id.* at 54:17-25.) She testified to the ritualistic use of moments of silence and explained that she had a practice of draping Rosary Beads over water bottles while volunteering. (*Id.* at 55:20-23, 60:11-14.)

The depth, importance, and centrality of these beliefs caused Defendants to restructure their lives to engage in this volunteer work. Hoffman testified that she moved from Virginia to Tucson, Arizona, to volunteer with No More Deaths (RT3 at 54:3-19); Orozco-McCormick at one point did the same although she no longer lives in Tucson (RT3

at 15:4-7); and Holcomb and Huse have made time to repeatedly travel to Arizona to volunteer (RT2 at 147-48; RT3 at 84).

Importantly, the fact that Defendants do not profess belief in any particular established religion does not bar their RFRA claim. *See Frazee v. Illinois Dept. of Employment Sec.,* 489 U.S. 829, 834 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization.")*; Love v. Reed*, 216 F.3d 682, 688–89 (8th Cir. 2000) ("To suggest that Love's belief-system falls short of being a religion would be to call into question the religious standing of all those who infuse Judaism, Christianity, or other 'traditional' religions with personal interpretation and introspection."); *Dettmer v. Landon*, 799 F.2d 929, 932 (4th Cir. 1986) (finding that Wicca could be a "religion" despite being a "conglomeration" of "various aspects of the occult, such as faith healing, self-hypnosis, tarot card reading, and spell casting").

Nor is the Government's argument that Defendants failed to establish their religiosity because they "described their beliefs in the broadest terms" persuasive. (Gov. Br. at 9.) Defendants do not claim to be practiced theologians, and they need not be in order to claim a religious exemption. As the Supreme Court has admonished, this Court may not "undertake to dissect religious beliefs" merely because those "beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas,* 450 U.S. at 715.

Defendants' religiosity is also apparent from their choice to associate themselves with the Unitarian Universalist Church and to adopt elements of Christian faith. In *Callahan v. Woods,* the Ninth Circuit found nontraditional beliefs to be "clearly" religious where they were "closely tied to a theistic belief." 658 F.2d 679, 685 (9th Cir. 1981). In that case, the claimant sought an exemption from a requirement that he obtain a social security number for his daughter, as he believed personal identification numbers were the "mark of the beast" and tools of the Antichrist. *Id.* at 682. Because of their relationship with Christianity, the Ninth Circuit found these beliefs religious rather than philosophical.

*Id* at 681.

Here, as in *Callahan,* Defendants hold views which, although perhaps idiosyncratic, are "closely tied" to traditional Christian beliefs. *Id* at 685. Defendants Holcomb and Hoffman testified that they substantially adhered to the views of the Presbyterian minister John Fife. (RT2 at 149:1-2; RT3 at 55:10-13.) Defendant Orozco-McCormick traced her beliefs in large part to her father's Catholicism. (RT3 at 12:14-18.) Defendant Huse traced her views to her experiences going to church while growing up. (RT3 at 97:2-5.) Moreover, Defendants chose to associate themselves with an organization considered a "ministry" of the Unitarian Universalist Church, and they identified themselves affirmatively as "from the Church" upon encountering the FWS Officer who observed them leaving food and water on the CPNWR. (Tr. Ex. 40 at 1:36-1:42.) Defendants also chose to use distinctly Christian symbolism, including the drawing of crucifixes on bottles of water (RT3 at 20:16); the distribution of rosary beads (*id.* at 60:11-14); the writing of "vaya con Dios," ("go with God,") on bottles of water (RT2 at 171:17-22); and the construction of altars (*id.* at 173:15-22), all of which show that Defendants' beliefs are "closely tied" to traditional Christian beliefs. *Callahan*, 658 F.2d at 685.

The Court concludes that Defendants' beliefs, as described, are religious. The Court must now consider if Defendants' sincerely hold those beliefs. An individual's claim that her belief "is an essential part of a religious faith" is entitled to "great weight" in the "intensely personal area" of religious liberty. *Seeger*, 380 U.S. at 184. The Court's inquiry into sincerity is therefore "limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud on the court[.]" *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014).

The Government's sole argument as to insincerity is that Defendants have merely "recited" religious beliefs "for the purpose of draping religious garb over their political activity." (Gov't Br. at 10.) However, the Government's bright-line distinction between "political" and "religious" motivations fails as a matter of law. It is well established that sincere religious beliefs are no less deserving of protection merely because they may overlap with political or other secular beliefs. *See, e.g., Hobby Lobby*, 573 U.S. at 688-736

(finding RFRA violation in context of politically controversial contraception mandate). The Ninth Circuit has explained that religious beliefs are deserving of protection even when they overlap with secular beliefs:

> [The] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one. In *Yoder*, the Supreme Court warned that a belief that is based on 'purely secular considerations' merits no protection under the free exercise clause. It did not limit the scope of the First Amendment to 'purely religious' claims; the area of overlap is presumably protected.

*Callahan,* 658 F.2d at 684 (internal citation omitted). The same is true here. While the Government points to evidence that could imply that some Defendants may have secular, philosophical, or political beliefs that overlap with their spiritual commitments, the Government points to no evidence that Defendants are informed by "purely secular considerations." *Id.* To the extent that Defendants do hold complementary religious and secular motivations and beliefs, the "area of overlap is presumably protected." *Id.*

The record lacks the type of evidence that has caused other courts to doubt a claimant's sincerity. For example, the Ninth Circuit expressed skepticism as to a RFRA claimant's sincerity in the case of the "Hawaii Cannabis Ministry," a profit-making enterprise whose website "prominently displayed an assurance that members" would escape "conviction of marijuana charges . . . as soon as you sign up." *See Christie,* 824 at 1051. The Ninth Circuit similarly expressed "reservations" about the sincerity of a RFRA claimant who failed to explain why his purported religious beliefs prohibited the drawing of blood for a legally mandated DNA test and yet permitted his tattoos and intravenous drug usage. *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007). Another court expressed skepticism where a criminal defendant allegedly told co-conspirators that he would take sole responsibility for a drug-trafficking conspiracy "so that [he] could 'try out' his religious freedom defense." *Meyers,* 95 F.3d at 1479. Unlike in those cases, there is no reason here to suspect that Defendants are "seeking to perpetrate a fraud on the court[.]" *Yellowbear*, 741 F.3d at 54.

Additionally, the nature of Defendants' conduct itself suggests sincerity.

- 13 -

Defendants were convicted for activities that included hiking food and water into a rugged, unforgiving wilderness during Southern Arizona's extreme August heat. The temperature at the time of the Defendants' conduct was over 100 degrees Fahrenheit.[6] As one Defendant testified, providing aid in this environment was "incredibly straining on the body" because "at that temperature . . . you're dehydrated just by being there" and so "your brain is kind of fuzzy" and it is "hard to think clearly." (RT2 192:11-20.) As another described the heat: "I mean, it's exhausting. It's heavy. Like, it feels like . . . a blanket. There's nowhere to . . . hide from the sun." (RT3 at 17:9-11). As another put it: "[H]iking around in 110 degrees is not what I want to be doing with my time, but I do it because I feel the need to and obligated to be there and do my part." (RT1 at 96:17-21.)

Defendants' willingness to endure hardship for their beliefs is analogous to the defendant's actions in *Ward*, 989 F.2d at 1019. In that case, the Ninth Circuit found that a religious liberty claimant who declined to testify in his own defense because he purportedly had a religious objection to taking an oath of honesty was sincere in his religious beliefs. *Id.* The Court explained that the claimant's choice not to testify in his defense, notwithstanding his professed innocence, suggested "the sincerity of true religious conviction." *Id.* As in *Ward,* Defendants' willingness to suffer for their beliefs likewise suggests such sincerity.

The Government has not identified any evidence in the record that would support a conclusion that Defendants are "patently devoid of religious sincerity[.]" *Callahan*, 658 F.2d at 683 (internal quotation marks omitted). The Court concludes that Defendants' beliefs are sincerely held.[7]

. . . .

---

[6] There was a dispute at trial whether the temperature at the time was 102 degrees or 110 degrees. (*Compare* Tr. Ex. 9 with Tr. Ex. 14.)

[7] Consideration of sincerity, which is a question of fact, should include consideration of Defendants' "credibility and demeanor" while testifying. *United States. v. Zimmerman,* 514 F.3d 851, 854 (9th Cir. 2007). Magistrate Judge Velasco heard testimony from each Defendant as to her beliefs and did not express any reservations about Defendants' sincerity. Because the Court concludes that, on this record, it would find clear error even if Judge Velasco had made an adverse credibility finding and found Defendants insincere, the Court need not remand for additional factual findings.

**B.    Substantial Burden**

To claim an exemption under RFRA, Defendants must demonstrate that enforcement of the CPNWR regulations "substantially burden[s]" the exercise of their religious beliefs. *Navajo Nation*, 535 F.3d at 1068. A substantial burden exists "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit" or when a believer is "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* at 1070. The substantial burden inquiry must not stray into a judgment as to whether a claimant's beliefs are reasonable. *See e.g., Hobby Lobby,* 573 U.S. at 724 (explaining that "whether the religious belief asserted in a RFRA case is reasonable" is a "very different question that the federal courts have no business addressing"); *Smith,* 494 U.S. at 887 ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine . . . the plausibility of a religious claim").

Here, enforcement of these regulations against Defendants threatens to "coerce" them, via "criminal sanctions," into abandoning conduct that is an exercise of religion. *Navajo Nation*, 535 F.3d at 1070. The prosecution of Defendants prevents them "from participating in an activity motivated by sincerely held religious beliefs." *Yellowbear*, 741 F.3d at 55. The prosecution of Defendants therefore substantially burdens their religious exercise by placing upon them "considerable pressure to abandon the religious exercise at issue." *Id.*

The Government argues that Defendants cannot demonstrate a substantial burden on their religious exercise because "their only evidence as to substantial burden is that they were required, like all other members of the general public, to comply with the regulations governing the CPNWR." (Gov. Br. at 11.) Those regulations are for "all members of the public, not just the defendants." (*Id.*) This argument ignores the central purpose of RFRA, which is to prevent the Government from substantially burdening "a person's exercise of religion even if the burden results from a rule of general applicability[.]" § 2000bb-1(a). RFRA exists precisely to provide, where appropriate, exemptions from "rules that apply to

all members of the public."

The Government next argues that "the government may take actions on its own land that will virtually destroy an individual's ability to practice their own religion." (Gov. Br. at 11 (internal quotation and citation omitted).) In support of this proposition, the Government cites to *Navajo Nation.* 535 F.3d at 1072. However, the *Navajo Nation* court performed a thorough substantial burden analysis on the claims in that case, determining that a negative effect on the claimants' "subjective, emotional religious experiences" was insufficient to demonstrate a substantial burden in the absence of evidence that claimants would lose a governmental benefit or face criminal or civil sanctions for practicing their religious beliefs. *Id.* at 1070. Here, in contrast, Defendants face criminal sanctions for exercising their religious beliefs, and so *Navajo Nation* is inapposite. *Id.*

The Government also argues that Defendants have not established that their religious beliefs "required" them "to enter the CPNWR without the proper permits, drive on a restricted administrative road, or abandon personal property in violation of the regulations governing CPNWR." (Gov. Br. at 11.) Defendants, the Government argues, had "other locations available for them to place their cache of supplies," outside of the CPNWR. (*Id.*) Since Defendants did not "need" to enter the CPNWR, the Government argues, enforcement of the regulations could not cause a "substantial burden." (*Id.*)

However, Defendants, do not need to show that their beliefs "required" them to conduct their religiously motivated activities on the CPNWR in order to succeed on their RFRA claim. (*Id.*) As amended, RFRA protects "*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief.*" § 2000cc-5(7)(A) (emphasis added). "[A] burden can be 'substantial' even if it does not compel or order the claimant to betray a sincerely held belief[.]" *Yellowbear*, 741 F.3d at 55. Accordingly, Defendants need not establish that their beliefs "required" them to enter the CPNWR. Rather, Defendants must only show that enforcement of the regulations against them causes them "considerable pressure" to abandon *any* exercise of religion. *Id.*

Nonetheless, Defendants did show that their conduct was required by their spiritual

beliefs. Defendants claim that their religious and spiritual commitments led them to volunteer with No More Deaths, the goal of which is to "try and save as many lives as [possible]" by providing humanitarian aid "where most of the death [is] occurring in the desert." (RT1 at 201:21-23.) The evidence introduced at trial showed that 32 sets of human remains were recovered from the CPNWR during 2017 alone. (Tr. Ex. 133.) Defendants are charged with conduct that took place in August, when the chance of death was highest due to the extremely high temperatures. (*Id.* at 180:9-24.) Given Defendants' professed beliefs, the concentration of human remains on the CPNWR, and the risk of death in that area, it follows that providing aid on the CPNWR was necessary for Defendants to meaningfully exercise their beliefs.

Finally, the Government argues that Defendants' admitted failure to obtain a permit bars them from bringing a RFRA challenge. (Doc. 97 at 11.) However, it is undisputed that the amended permit application explicitly prohibited leaving food and water on the CPNWR. (RT1 at 74:1-17.) The regulation that Defendants are charged with violating, 50 C.F.R. 26.22(b), requires a CPNWR entrant to (1) obtain a permit and (2) follow the permit's terms and conditions. Defendants could not have exercised their religious beliefs by leaving food and water on the CPNWR without violating the permitting regulation— either by not obtaining a permit or alternatively by not adhering to the permit's terms and conditions. Because obtaining permits would not have allowed Defendants to lawfully conduct the activities for which they are being prosecuted, Defendants were not required to apply for permits to claim a RFRA exemption. *See United States v. Adeyemo*, 624 F. Supp. 2d 1081, 1085 (N.D. Cal. 2008) ("[W]here it would have been futile to apply for a permit, that person need not apply for a permit to bring a RFRA challenge."); *see also United States v. Hardman*, 297 F.3d 1116, 1121 (10th Cir. 2002).

The Court concludes that the prosecution of Defendants for these actions substantially burdens their religious exercise. As Defendants successfully carried this burden, it fell to the Government to demonstrate that prosecution of Defendants was the least restrictive means of achieving a compelling governmental interest.

**C.     Compelling Interest**

Requiring the Government to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The "compelling interest" inquiry requires courts to look past "broadly formulated interests," and to instead "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirta Beneficente Uniao do Vegetal,* 546 U.S. 418, 431 (2006).

The Government argues on appeal that the burden on Defendants' religious exercise is justified by a "compelling interest" in furthering "the national decision to maintain [the CPNWR] in its pristine nature." (Gov. Br. at 12.) The Government, however, has not established that providing an exemption to Defendants would frustrate that interest. The evidence at trial established that the CPNWR is a former active military bombing range that has unexploded munitions strewn about. (RT1 at 86:17-23). The Refuge is currently both a corridor for unlawful entry into the United States (RT1 at 19:3-4), which produces significant amounts of garbage (RT3 at 59:20-22), and also a site of significant law enforcement activity, which takes its own environmental toll (RT1 at 134:25—135:1-3). In other words, as Magistrate Judge Velasco found, the CPNWR is "littered with unexploded military ordinance, the detritus of illegal entry into the United States, and the on-road and off-road vehicular traffic of the U.S. Border Patrol efforts to apprehend illegal entrants/undocumented immigrants." (Doc. 166 at 1.) Given this context, the Government cannot claim a compelling interest in "maintain[ing]" the CPNWR as "pristine."

The Court agrees the Government has a compelling interest in maintaining the environmental conditions on its public lands. But in the RFRA context, the compelling interest inquiry requires the Government to demonstrate a compelling interest in "the application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *See Hobby Lobby,* 573 U.S. at 726 (internal quotation marks and citations omitted). Particularly given the conditions on the

CPNWR, the Government has failed to articulate any "marginal" compelling interest, beyond its general interests, in enforcing the CPNWR regulations against these "particular" Defendants. *Id* at 727.

Moreover, the record shows that Defendants' conduct does not have significant negative effects on the environmental conditions of the CPNWR. Any environmental damage caused by the "abandoning" of food and water is mitigated by Defendants' practice of bringing garbage bags and picking up as much trash as possible. (RT2 at 171:1-8; RT3 at 21:12-17, 60:1-2.) As one Defendant explained: "[O]ur packs are empty by the time we get there, and we replace that with the garbage that's around the area, and it's not always necessarily our garbage either." (RT3 at 88:21-24.) Defendants' testimony on this point is supported by FWS Officer West's body camera footage, which shows at least one Defendant removing empty, crushed water bottles from her backpack upon returning to the truck. (Tr. Ex. 40 at 0:54-1:25.)

Nor has the Government shown that Defendant Hoffman's driving on a pre-existing "administrative" road in order to reach a remote area of the Refuge has a significant negative impact on the CPNWR. (RT1 at 135:3-6.) It is not alleged that Defendants ever went off-road in a vehicle. In contrast, Border Patrol and other law enforcement officers go off-road into the wilderness on the CPNWR with some regularity. (RT1 at 131:3-7.) Members of the public are also regularly granted permission to drive on restricted-access roads for research or other purposes. (RT1 at 127:1-3.) Given these exemptions, the Government cannot claim a compelling interest in uniform prevention of access to these roads. *See Gonzalez,* 546 U.S. at 432-33 (finding that exemptions in Controlled Substances Act undercut an asserted compelling interest in uniform application of that law).

No more persuasive is the Government's argument that "permitting an exemption for these four defendants" would "quickly lead" to a flood of religious objections. (Doc. 79 at 15.) The Supreme Court has squarely rejected such "slippery slope" concerns, noting that such concerns "could be invoked in response to any RFRA claim for an exception to a generally applicable law." *Gonzales*, 546 U.S. at 435–36. The slippery-slope argument

fails in the RFRA context, where a "case-by-case" application of the statutory test is required to determine whether, in a particular instance, a law of general applicability must give way to an individual's free exercise of their religion. *Id.*

The Government has also asserted a compelling governmental interest in "enforcing the border and controlling immigration." (RT3 at 168; Doc. 94 at 13.) Although Defendants were not charged with any immigration-related offense, the Government nonetheless claims that Defendants' actions "furthered and encouraged illegal smuggling activity in the CPNWR." (Doc. 94 at 13.) The Government seems to rely on a deterrence theory, reasoning that preventing clean water and food from being placed on the Refuge would increase the risk of death or extreme illness for those seeking to cross unlawfully, which in turn would discourage or deter people from attempting to enter without authorization. In other words, the Government claims a compelling interest in preventing Defendants from interfering with a border enforcement strategy of deterrence by death. This gruesome logic is profoundly disturbing. It is also speculative and unsupported by evidence. As discussed above, 32 sets of human remains were recovered from the Refuge in 2017 alone, and the Government produced no evidence that these fatalities had any effect in deterring unlawful entry. Nor has the Government produced evidence that increasing the death toll would have such an effect.

The Court concludes that the Government failed to demonstrate that it furthered any compelling interest by prosecuting Defendants.

**D.     Least Restrictive Means**

Even if the Government had established a compelling interest, it did not show that it cannot further that interest while accommodating Defendants' religious beliefs.

"The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby,* 573 U.S. at 728. The Government "must demonstrate that 'no alternative forms of regulation' would" suffice to accomplish the Government's compelling interest. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 480 (5th Cir. 2014) (quoting *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)). This "focused inquiry" means that the Court may "not

ease the government's burden by rubberstamping vague or generalized arguments about means and ends." *Christie*, 825 F.3d at 1063.

Defendants have suggested alternative means of maintaining the environmental integrity of the CPNWR while also allowing a religious exemption. (Def. Br. at 15-17.) For example, the Government "could allow these defendants to leave water and food at certain designated points on the refuge, so long as they maintained their practice of removing all trash they encountered on their hikes, including and especially used water bottles and food cans formerly left by No More Deaths volunteers." (*Id.* at 16.) The Government does not explain why such an arrangement would not allow it to achieve its interest in protecting the environmental integrity of the CPNWR. The Government states that Defendants' "suggested alternatives do not address [harm to the CPNWR] in the slightest" (Gov. Br. at 12), but it fails to provide evidence or explanation of why this is so.

The Court concludes that the Government failed to demonstrate that the prosecution of Defendants is the least restrictive means of achieving a compelling governmental interest.

## VI.    Conclusion

Defendants met their burden of establishing that their activities were exercises of their sincere religious beliefs, and the Government failed to demonstrate that application of the regulations against Defendants is the least restrictive means of accomplishing a compelling interest. Accordingly, the Court finds that application of the regulations against Defendants violates RFRA, and the Court will reverse Defendants' convictions.

Accordingly,

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

**IT IS ORDERED** that Defendants' convictions are **reversed**. The Clerk of Court shall randomly reassign this case to a magistrate judge for entry of a judgment of acquittal and vacatur of Defendants' sentences. Any fines or fees paid by Defendants shall be returned to them, and Defendants' probation shall be terminated.

Dated this 31st day of January, 2020.

_____
Honorable Rosemary Márquez
United States District Judge